**GARRICK B. by his parents GARY B. and Linda B., Plaintiffs,**

v.

**CURWENSVILLE AREA SCHOOL DISTRICT, and D. Kay Wright, Acting Secretary of Education, Commonwealth of Pennsylvania, Defendants.**

Civ. A. No. 86–1626.

United States District Court, M.D. Pennsylvania.

Sept. 24, 1987.

Larry B. Selkowitz, Widoff, Reager, Selkowitz & Adler, Harrisburg, Pa., for plaintiffs.

Paul L. Stevens, Curtin & Heefner, Doylestown, Pa., for defendant Curwensville Area School Dist.

LeRoy S. Zimmerman, Atty. Gen., Harrisburg, Pa., for defendant D. Kay Wright.

## MEMORANDUM

CALDWELL, District Judge.

*Introduction*

Before the court is an appeal of a decision of the Pennsylvania Secretary of Education under the Education of the Handicapped Act, ("EHA"), 20 U.S.C. § 1401 *et seq.* The parties have filed motions for judgment pursuant to 20 U.S.C. § 1415(e). The record is complete, briefs have been

filed, and the motions are ripe for disposition.

*Background*

Garrick B. is a 15 year old exceptional student who attends school in the Curwensville Area School District. His educational program has been the subject of dispute for a number of years. While in first grade, Garrick was classified as an educable mentally retarded ("EMR") student and was subsequently placed in an EMR program operated by Central Intermediate Unit 10 ("CIU 10"). Garrick's parents objected to the classification and special education program, claiming that Garrick was not retarded, but learning disabled ("LD"). In February 1984, a hearing officer appointed by the Secretary of Education determined that the District's classification was appropriate, but that a new individualized education program ("IEP") was needed for the 1984–85 school year. During that year, Garrick remained in a part-time elementary EMR program.

For the 1985–86 school year, the District recommended that Garrick be placed in a mixed category, LD/EMR class (LD & EMR students in the same classroom), and proposed a new IEP. His parents agreed to the placement for a 13 day trial period, at the end of which they objected to both the mixed category program and the EMR classification. A hearing was scheduled for January, 1986. Prior to the hearing, the parties agreed that Garrick would be placed in a self-contained LD class at Curwensville School.

At the close of the 1985–86 school year, the parents were not satisfied with the placement and the hearing was reconvened on June 3, 1986. The District contended that Garrick was correctly classified EMR and that a LD/EMR class at Curwensville School was appropriate. The parents claimed that Garrick was not EMR but was either LD or brain damaged and that a mixed category placement was not appropriate. They sought full-time residential placement in an approved private school. Following two days of testimony and the introduction of over 100 exhibits, the hearing officer found that Garrick is not men-

tally retarded, has a medical diagnosis of brain damage ("BD"), and is educationally a BD/LD student in accordance with state standards at 22 Pa.Code § 341. He recommended that Garrick be placed in a secondary level, part-time, mixed category (LD/EMR) program operated by CIU 10. Garrick was so enrolled.

Both parties filed with the Department of Education exceptions to the hearing officer's report. The District sought reversal of the decision on classification and the parents sought placement at a residential school for BD/LD students. On October 15, 1986, the Secretary of Education adopted the hearing officer's decision and dismissed the exceptions. She found that Garrick was properly classified as a LD student, and that the proposed placement in the LD/EMR program was appropriate and in accordance with the priority order of placement set forth in 22 Pa.Code § 13.-11(d).

Garrick's parents filed this action alleging that the Secretary and the District violated the EHA, 20 U.S.C. § 1414; the regulations issued pursuant thereto, 34 C.F.R. §§ 300.300 *et seq.;* the Public School Code of 1949, 24 P.S. § 13–1372 *et seq.;* and the regulations issued thereunder, 22 Pa.Code §§ 13.1 *et seq.* They seek a finding that the Secretary's decision upholding the recommendation of the hearing officer is not supported by a preponderance of the evidence in the record, an order directing that Garrick be placed in a full-time residential school for LD children, attorney's fees and costs. The District has filed counter and cross claims seeking a reversal of the Secretary's classification of Garrick, an order directing that it be changed to EMR, and fees and costs.

The parties have filed motions for disposition pursuant to 20 U.S.C. § 1415(e)(2). The District has also filed a motion to dismiss for lack of subject matter jurisdiction. The record is complete and the court has before it the records of the administrative proceedings and supplemental affidavits submitted by the parties. The parties have waived hearing, filed briefs, and re-

served the question of attorneys' fees and costs.[1]

*Discussion*

## A. *Subject Matter Jurisdiction*

█ The district contends that the court lacks subject matter jurisdiction to adjudicate this action, brought in accordance with the procedure outlined in 20 U.S.C. § 1415. Paragraphs (2) and (4) of subsection (e) are clear in their pronouncement that the district courts of the United States shall have jurisdiction of such actions. But the district claims that § 1415 does not apply to it because it does not "receive assistance" under the EHA. In support of this assertion, the District superintendent has filed an affidavit stating that the District has not received any "federal funds" for special education purposes.

The District's contention that in order to "receive assistance" it must directly receive federal funds is not supported by the language of the Act or the accompanying regulations. Section 1415(a) provides:

(a) Any State educational agency, *any local educational agency,* and any intermediate educational unit *which receives assistance* under this subchapter shall establish and maintain procedures in accordance with subsection (b) through subsection (e) of this section to assure that handicapped children and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies and units.

20 U.S.C. § 1415(a) (emphasis added). To ensure a "free appropriate public education" for handicapped children, the EHA provides subsidies to states meeting certain eligibility requirements. 20 U.S.C. § 1412. Local and intermediate educational agencies are then entitled to share those funds upon approval by the state educational agency. 20 U.S.C. §§ 1411 & 1414. The state is authorized to withhold payment to local agencies and divert such payments to regional or state agencies which provide

services directly to handicapped children in the local agency's area. Thus a local agency can receive federal assistance indirectly.

In Pennsylvania, school districts bear primary responsibility for identifying and educating exceptional children. 24 P.S. §§ 13–1371 & 13–1372. The districts may provide the education directly or through intermediate units. 24 P.S. § 13–1372; 22 Pa.Code § 13.11(b). The District does not deny that it has used the services of an intermediate unit, and in fact Garrick has participated in a CIU 10 EMR program. Therefore, when CIU 10 receives EHA funds the District is the indirect recipient of the federal assistance. *See Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984).

This conclusion is supported by the federal regulations promulgated by the Department of Education. 34 C.F.R. § 300.2 provides in part:

(a) *States.* This part applies to each State which receives payments under Part B of the Education of the Handicapped Act.

(b) *Public agencies within the State.* The annual program plan is submitted by the State educational agency on behalf of the State as a whole. Therefore, the provisions of this part apply to all political subdivisions of the State that are involved in the education of handicapped children. These would include:

(1) The State educational agency, (2) local educational agencies and intermediate educational units....

The comment to this section provides that the "requirements of this part are binding on each public agency that has direct or delegated authority to provide special education and related services in a State that receives funds under Part B of the Act, regardless of whether that agency is receiving funds under Part B."

The District attempts to avoid the conclusion that it is a recipient of federal assistance within the meaning of § 1415 by argu-

---

**1.** Our analysis and review of this controversy leads us to conclude that the arguments raised and advanced by both sides are substantial and non-frivolous. Although we do not decide the

question, the court's initial reaction is that no party would be entitled to recover fees in this proceeding.

ing that it is an intended beneficiary rather than an intended recipient of federal assistance. *See, Dept. of Transportation v. Paralyzed Veterans,* 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986). While it is true that the coverage of § 1415 does not extend beyond the recipient of aid to those who merely benefit from it, it is clear that Congress intended the recipients of federal assistance to be those entities that are directly responsible for providing special education. From the Pennsylvania statutory scheme, it is equally clear that the school districts bear that responsibility. Therefore the Curwensville School District is much more than a mere beneficiary and the court has subject matter jurisdiction.

**B.** *Standard of Review*

The EHA provides federal subsidies for states to ensure that all handicapped children have available to them a "free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c). A state must establish:

procedures to assure that, to the maximum extent appropriate, handicapped children, including children in public or private institutions or other care facilities, are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily....

20 U.S.C. § 1412(5)(B). The local educational agency or intermediate unit must establish or revise an individualized educational program ("IEP") for each handicapped child at the beginning of each school year. 20 U.S.C. § 1414(a)(5). Parents must be provided with written notice and an opportunity to complain whenever the evaluation or placement of their child is changed. 20 U.S.C. § 1415(b)(1)(C) & (E). Complaining parents are entitled to an impartial due process hearing and subsequent review by the state. 20 U.S.C. § 1415(b)(2)

& (c). An aggrieved party may then bring a civil action in a federal district court. "[T]he court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e).

The Supreme Court decided the correct standard of review under § 1415(e) in *Hendrick Hudson District Board of Education v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The Court, in rejecting the notion that courts are limited to reviewing for procedural compliance with the Act, mandated a two-step inquiry: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* at 206–07, 102 S.Ct. at 3051, 73 L.Ed.2d at 712.

The first *Rowley* requirement has been satisfied in this case and is not challenged by the parties. Under the second step, the court must examine the record and supplemental evidence and must make an independent decision based on a preponderance of the evidence, giving due weight to state administrative proceedings. How much deference to give state educational agencies is a matter for the court's discretion.

The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.

*Gregory K. v. Longview School District,* 811 F.2d 1307, 1311 (9th Cir.1987) (*quoting Town of Burlington v. Dept. of Edu-*

*cation,* 736 F.2d 773, 792 (1st Cir.1984), *affd.* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).

### C. *Classification*

■ The record is replete with results of tests and evaluations that Garrick has received over the years. At issue are not the results themselves, but the experts' interpretations of them. The application of medical and psychological definitions and theories to test data has not yielded a consensus as to whether Garrick is LD or EMR. Viewing the undisputed facts in the light of the experts' opinions and the applicable state regulations, the weight of the evidence supports the Secretary's classification of Garrick as BD/LD.

The following definitions are set forth at 22 Pa.Code § 341.1:

(i) *Brain damage*—A moderate to severe injury to the brain, as identified by a neurological examination, resulting in severe behavior and learning disorders. Persons whose behavior and learning disorders are primarily the result of visual, hearing, or motor handicaps, mental retardation, emotional factors, or environmental disadvantage are not brain injured. The term brain damage does not include the condition known as minimal brain disfunction.

. . . .

(iii) *Learning disability*—A deficiency in the acquisition of basic learning skills, including but not limited to the ability to reason, think, read, write, spell, or do mathematical calculations, as identified by an educational and psychological evaluation. Persons who have learning disorders which are primarily the result of visual, hearing, or other handicaps, mental retardation, emotional factors, or environmental disadvantage are not learning disabled. The term learning disability does not exclude the possibility that a learning disabled person may also exhibit such conditions as brain damage or minimal brain disfunction. A person shall be assigned to a program for the learning disabled when the evaluation and Individualized Education Program indicate that such a program is appropriate; provided

that the evaluation clearly indicates that the person can demonstrate average or above average intellectual functioning on an appropriate intelligence measure. The evaluation shall include an assessment of specific academic strengths and weaknesses.

. . . .

(v) *Mentally retarded*—Impaired mental development which adversely affects the educational performance of a person. A mentally retarded person exhibits significantly impaired adaptive behavior in learning, maturation, or social adjustment as a result of subaverage intellectual functioning. The degree of retardation and the level of social and academic functioning, not deviant behavior patterns, shall be the factors in determining the individualized program. A person shall be assigned to a program for the mentally retarded when the evaluation and Individualized Education Program indicate that such a program is appropriate; provided that no person shall be assigned to a program for the:

(A) educable mentally retarded unless the IQ score of that person is lower than 80. . . .

. . . .

*IQ Score*—An IQ score with consideration for a plus or minus five standard error of measurement as measured by an individual psychological test.

At previous stages of this proceeding, the District has challenged the finding that Garrick is BD. From the pleadings and briefs filed in this action, it is unclear whether that is still its position. At any rate, the evidence in the record supports such a finding. Based on neurological examinations, experts for all three parties have concluded that Garrick is BD.

This determination is not dispositive of the question of the appropriate classification for this child. A finding that Garrick is BD does not preclude a finding of either LD or EMR. *See* 22 Pa.Code § 341.1(iii), (v). Determining the proper nomenclature requires analysis of the evidence in the augmented record and interpretation of state regulations. Admittedly, this is a

close question, but the preponderance of the evidence indicates that a classification of LD is appropriate.

The parties agree that 22 Pa.Code § 341.-1(v) requires an IQ score of less than 80 before a child may be classified as an EMR student. On May 15, 1985 and May 5, 1986, Garrick scored above 80 on Wechsler Intelligence Scale for Children—Revised ("WISC–R") evaluations. On September 25, 1985, however, he scored 78 on a Stanford Binet evaluation. The District claims that this score requires an EMR classification. But read in its entirety, the psychologist's report indicates that Garrick's IQ is actually higher and that he is of "low average" intelligence:

> The ratio between mental and chronological age yields an intelligence quotient of 78 which is in fact closely in accord with Dr. Little's WISC results and with most prior testing realizing both the WISC and the Stanford Binet. On the present administration of the Stanford Binet, basal age was established at year eight and test ceiling was attained by year twelve. He scores at the high end of the borderline range, and the clinical impression is that he functions on the Stanford Binet essentially in a manner and at a level reflecting at least low average innate intellectual endowment. As will be noted below Garrick exhibits exceeding difficulty with auditory recall, and therefore is unable to pass the "repeating four digits reversed" at the nine year level. If he had passed this test item, basal age would have been at year nine rather than at eight, and that would have itself elevated the youngster's overall I.Q. to the 80 level. The only test item he failed on the Stanford Binet at the ten year level is "repeating digits", and one of the three items he failed at the eleven year level is "memory for sentences". My clinical judgment is that, as substantiated below, the boy's auditory recall is severely deficient and this artificially depresses the Stanford Binet score which would, by my clinical judgment, in all likelihood be at about I.Q. 85 if it were not impeded in this way by specific deficit.

Record, page 573a. After consideration of the results of all the psychological testing performed on Garrick, the court finds that his IQ is not below 80. Thus a classification of EMR is precluded.

The District challenges the Secretary's finding that Garrick's most recent WISC–R scores of Verbal 88, Performance 90, and Full Scale 88, puts him within the average range of 90–110. 22 Pa.Code § 341.1(iii) does not by its terms mandate an IQ score in the average range. It requires an educational and psychological evaluation which "clearly indicates that the person can demonstrate average or above average intellectual functioning on an appropriate intelligence measure." It is clear that the Secretary did not base her classification decision solely on the results of one IQ test. The record supports the conclusion that Garrick can demonstrate at least low average intellectual functioning. The results of various tests conducted over the years show areas of weakness which are consistent with a learning disability. Therefore the court finds that Garrick is properly classified as a LD student.

### D. Placement

■ In assuring that the requirements of the EHA have been met, the court must follow the principles announced in *Rowley* and may not impose its view of preferable educational methods upon the state. "[T]he provision that the reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051, 73 L.Ed.d at 712. Courts lack the specialized knowledge and experience necessary to resolve difficult questions of educational policy, and the primary responsibility for formulating the education to be accorded a handicapped child was left by the Act to state and local educational agencies, in cooperation with the child's parents.

The ultimate question is whether Garrick is receiving a "free appropriate public education." 20 U.S.C. § 1412(1). The court's

inquiry is limited to whether "the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051, 73 L.Ed.2d at 712. The question is not whether, in the court's lay opinion, the program recommended by the District offers the greatest possible benefits to Garrick, or whether the private placement desired by the parents is preferable to the District's program. The determination is simply whether Garrick is receiving sufficient educational benefits to satisfy the requirements of the Act. Therefore, much of the controversy between the parties is irrelevant in the context of this proceeding, for it is addressed to whether one program is better than the other.

> The EHA requires the state to establish: procedures to assure that, to the maximum extent appropriate, handicapped children … are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5). This indicates a clear congressional preference for "mainstreaming" of handicapped students. In furtherance of that policy, the federal regulations require each public agency to establish a continuum of alternative placements, giving priority to the least restrictive environment. 34 C.F.R. § 300.551. In Pennsylvania, this is accomplished by 22 Pa.Code § 1311(d), which provides:

> (d) The following priority order of educational placement for handicapped school-aged persons shall be followed except where a deviation is needed to meet the appropriate needs of the person or the purpose of these regulations:
>
> (1) A regular class in a regular school with supporting services.
>
> (2) A school district special education program in a regular school, including homebound instruction.
>
> (3) A school district special education program in a special facility.
>
> (4) An intermediate unit program in a regular school.
>
> (5) An intermediate unit program in a special facility.
>
> (6) An approved private school program.
>
> (7) A State school program.

22 Pa.Code § 13.11(d). Garrick should be placed in an approved private school program only if placement in one of the less restrictive programs is not appropriate. The record does not support that conclusion.

The court understands the parents' desires for the best possible education for their son, but as noted above, our inquiry is limited:

> [A] placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming. The perception that a segregated institution is academically superior for a handicapped child may reflect no more than a basic disagreement with the mainstreaming concept. Such a disagreement is not, of course, any basis for not following the Act's mandate.

*Roucker on Behalf of Roucker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.1983).

The preponderance of the evidence shows that Garrick's placement is appropriate and that his needs can be met. The District implemented the IEP during the 1986–87 school year and Garrick progressed under it. In addition to academic training, Garrick's need for the cultivation of peer and social relationships is served.

*Conclusion*

The findings and decision of the Secretary of Education are supported by a preponderance of the evidence. Garrick B's classification as LD and placement in a mixed category LD/EMR class in the Curwensville School District are appropriate

and comport with the requirements of the EHA.

The status of the plaintiffs' state law claims is unclear. The Pennsylvania statute and regulations appear to track and implement the federal scheme. The propriety of separate state claims in this case is questionable, especially in light of *Town of Burlington v. Department of Education, Com. of Mass.*, 736 F.2d 773 (1st Cir.1984), *aff'd*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). This question, however, has not been addressed by the parties. Therefore, within five days, the plaintiffs shall give notice of their intention to pursue the state law claims. Failure to do so will result in dismissal of the state claims. The plaintiffs may, of course, elect to withdraw those claims and accept or appeal this decision.

### JUDGMENT AND ORDER

AND NOW, this 24th day of September, 1987, upon review of the augmented record, and in consideration of the motions of the parties, it is hereby ordered that:

1. Judgment be entered for defendants on Counts I and II of plaintiffs' complaint.

2. Judgment be entered for plaintiffs on the counterclaim of defendant Curwensville Area School District.

3. Judgment be entered for defendant Wright on the crossclaim of defendant Curwensville Area School District.

4. Within five (5) days of the date of this order, plaintiffs shall give notice that they will either pursue or withdraw the claims raised in Counts III and IV of their complaint. Should plaintiffs elect to pursue those claims, pre-trial motions shall be filed within five (5) days of such notice and briefed in accordance with Local Rules of Court.